FILED
DISTRICT COURT CLERK
WESTERN DISTRICT OF K[Y]

2018 JUL 11  AM 10: 25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

UNITED STATES OF AMERICA

v.

**CHARLEY BARBER**
**BRIAN KEITH CASEBIER**
**STEVE DEMOSS**
**BILLIE HEARLD**
**RON IVY**
**JOHN ELLIS SCOTT**
**DWIGHT FULKERSON**
**JEREMY HACKNEY**

INDICTMENT

NO. 4:18CR-15-JHM

18 U.S.C. § 371

INTRODUCTION

At times relevant to this Indictment:

1. Beginning no later than January 1, 2013, and continuing through August 8, 2015, the defendants, **CHARLEY BARBER**, **BRIAN KEITH CASEBIER**, **STEVEN DEMOSS**, **BILLIE HEARLD, RON IVY,  JOHN ELLIS SCOTT, DWIGHT FULKERSON**, and **JEREMY HACKNEY,** all defendants herein, and agents of Armstrong Coal Company, an unindicted co-conspirator, conspired to commit dust fraud by knowingly and willfully altering the company's required dust-sampling procedures, by circumventing the dust-sampling regulations, submitting false samples, and by making false statements on dust certification cards. The dust-sampling procedures are mandatory health and safety standards designed to protect the nation's

miners from the scourges of pneumoconiosis, commonly known as "black lung," and silicosis the most common coal-mine dust-caused diseases. Chronic exposure to respirable coal mine dust causes lung diseases that can lead to permanent disability and death. By circumventing the dust-sampling procedures, Armstrong Coal and its co-conspirators, avoided implementing ventilation and production controls that might cost money or lower production, and thus were able to save money at the expense of exposing the miners employed at the Parkway and Kronos mines to the risks of breathing air with elevated levels of respirable coal dust, increasing their risks of contracting black lung.

2. Armstrong Coal Company was the corporate operator of coal mines located in Muhlenberg and Ohio Counties, in the Western District of Kentucky, (the Parkway and Kronos mines) as defined in Title 30, United States Code, Sections 802(d) and was subject to the provisions of the Federal Mine Safety and Health Act, as amended, under Title 30, United States Code, Section 803, in that Armstrong Coal utilized equipment manufactured outside the state of Kentucky that entered into or affected interstate commerce.

3. **CHARLEY BARBER**, was Superintendent at Parkway Mine. **BRIAN KEITH CASEBIER** was Safety Director at Parkway Mine. **STEVEN DEMOSS** was Assistant Safety Director and later Safety Director at Parkway Mine. **BILLIE HEARLD** was a Section Foreman at Parkway Mine and later a miner at Kronos Mine. **RON IVY** was Safety Director at Kronos Mine. **JOHN ELLIS SCOTT** was employed in the Safety Department at Parkway Mine, and both **DWIGHT FULKERSON** and **JEREMY HACKNEY** were Section Foremen who performed dust sampling at Parkway Mine. All of these persons had Federal Dust Certification cards, meaning they had received training on the dust regulations referred to in this Indictment.

All of these persons were agents of Armstrong Coal Company as that term is defined in Title 30, United States Code, Sections 802(e) and 820(c).

4. In order to protect the mining industry's "most precious resource – the miner," Congress passed the Federal Mine Safety and Health Act of 1977, as augmented by the MINER Act of 2006 (hereinafter the Mine Act). A stated purpose of the Mine Act is to provide working conditions in underground coal mines sufficiently free of respirable dust concentrations so as to permit each miner the opportunity to work underground during the period of his or her entire adult life without incurring any disability from black lung and silicosis.

5. Black lung is an occupational lung disease typically not incurred by the general population. When coal dust particles enter the lungs, they irritate the delicate lung tissue and eventually form massive impenetrable fibrous tissue that significantly restricts the lung's functions and causes scarring, which can lead to lung failure and death. Once black lung develops, it cannot be reversed. Black lung is preventable, yet from 2005-2014 over 4,800 of the nation's miners died from black lung. Lowering the concentration of respirable coal mine dust in the air that miners breathe is the only means of preventing diseases caused by excessive exposure to such dust. There are no specific treatments to cure black lung. The chronic effects of black lung may progress even after the miners are no longer exposed to respirable coal dust resulting in increasing disability and death. Major sources of dust generation in continuous mining operations are continuous mining machines, shuttle cars and roof bolters. Major control methods for dust in mining operations are water and ventilation control systems.

6. The Mine Act ordered the Secretary of Labor, acting through an agency of the United States Department of Labor; that is, the Mine Safety and Health Administration (hereinafter

MSHA), to develop "mandatory health and safety standards for the protection of life and prevention of injuries in coal and other mines" which, subsequent to commentary and review, became law and to which each operator and its agents must adhere. Title 30, United States Code, Sections 801 and 811. These standards include requirements to monitor the mine atmosphere and take and record dust-samples as well as creating and maintaining records. These dust regulations improve the health protections for coal miners by reducing their occupational exposure to respirable coal mine dust and by lowering the risk they will suffer material impairment of health or functional capacity over their working lives.

7. Each mine operator is required by regulation to continuously maintain that the average concentration of respirable dust in the mine atmosphere during each shift not exceed 2.0 milligrams of dust per cubic meter of air as measured by an approved sampling device. (The permissible amount was reduced to 1.5 milligrams after August 1, 2014). Respirable dust levels are managed through the use of engineering controls like water sprays and ventilation control systems, as part of each mine's comprehensive methane and dust plan. To ensure that standards are met, dust-monitoring and sampling procedures mandate that each operator take accurate samples of the amount of respirable dust to which each miner in the active working portions of the mine is exposed. Samples are required to be submitted for 60-day sampling periods set for January 1 to February 28, March 1 to April 30, May 1 to June 30, July 1 to August 31, September 1 to October 30, and November 1 to December 31. Title 30, Code of Federal Regulations, Part 70.

8. Dust monitoring and sampling is required by regulation to be conducted by a certified person; that is, a miner who has passed an examination administered by MSHA personnel in the

dust regulations. This person must also maintain and calibrate the sampling devices used to conduct the tests. Title 30, Code of Federal Regulations, Part 70, Section 203.

9. Sampling devices must be worn by the miners being sampled from portal to portal; that is, from their entry to the mine until they exit. The sampling devices must also be operational during the entire shift. (Under regulations in force prior to August 1, 2014, the sampling devices were required to be operational for the entire shift or for 8 hours, whichever time was less). In mechanized mining machine units (MMU), such as those at Parkway and Kronos, the sampling device must be worn on the cutting machine operator within 36 inches inby (in the direction of the working face) from the normal working position.

10. A certified person is required to examine the sampling device during the second hour after it is put into operation to assure it is in the proper location and that it is operating properly and at the proper flowrate. In the last hour of operation a certified person is again required to examine the sampling device to assure it continued to operate properly and at the proper flowrate. The goal of this testing process is to achieve five valid representative samples which must be collected on consecutive normal production shifts. (What constitutes a minimum or normal production shift is governed by regulation; however, if a normal production shift is not achieved, MSHA may void the sample).

11. A person certified in sampling must properly complete the dust data card that is provided by the manufacturer for each filter cassette. (Under the post August 1, 2014 regulations the person completing the card must be the same person who actually performed the examinations on the sampling equipment referenced above). Within 24 hours after the end of the sampling shift the mine operator is required to mail the cassette and the corresponding dust data card to the

5

Respiratory Dust Processing Laboratory in Pittsburgh, PA. Title 30, Code of Federal Regulations, Section 70.210.

The Grand Jury charges:

## COUNT 1
*(Conspiracy to Defraud the U.S.)*

12. The Grand Jury re-alleges Paragraphs 1 through 11 as if fully incorporated here.

13. Between January 1, 2013, and August 8, 2015, in the Western District of Kentucky, Muhlenberg and Ohio Counties, **CHARLEY BARBER**, **BRIAN KEITH CASEBIER**, **STEVEN DEMOSS**, **BILLIE HEARLD**, **RON IVY**, **JOHN ELLIS SCOTT**, **DWIGHT FULKERSON**, and **JEREMY HACKNEY**, all defendants herein, and agents of Armstrong Coal Company, an unindicted co-conspirator, did knowingly, willfully, and voluntarily, combine, conspire, confederate and agree together and with other persons, both known and unknown to the grand jury, to defraud the United States and an agency thereof, that is MSHA, by deceit, trickery and dishonest means, of its lawful and legitimate function in the administration and enforcement of the Mine Act.

## OBJECT AND MEANS

14. The object and purpose of this conspiracy was to commit and to conceal from MSHA the ongoing, systemic, and pervasive violation of mandatory health and safety standards, including but not limited to the average concentration of respirable dust within Parkway and Kronos mines, along with violations of the monitoring and sampling requirements of the Mine Act.

6

15. Among the manner and means by which the defendants, and the unindicted co-conspirators known and unknown to the grand jury, carried out the objects of the conspiracy, were the following:

(a) **CHARLEY BARBER, BRIAN KEITH CASEBIER, STEVEN DEMOSS, BILLIE HEARLD, RON IVY, JOHN ELLIS SCOTT, DWIGHT FULKERSON,** and **JEREMY HACKNEY,** agents of Armstrong Coal Company, an unindicted co-conspirator, and other conspirators both known and unknown to the grand jury, did "switch off" miner operators during dusty conditions in Parkway and in Kronos mines while dust samples were being taken; that is, MMU operators were ordered to remove dust sampling equipment and place the equipment in clean air, or the operators themselves were replaced and the MMU was operated by persons not equipped with dust sampling equipment;

(b) **CHARLEY BARBER, BRIAN KEITH CASEBIER, STEVEN DEMOSS, BILLIE HEARLD, RON IVY,** and **DWIGHT FULKERSON,** agents of Armstrong Coal Company, an unindicted co-conspirator, and other conspirators both known and unknown to the grand jury, did remove and cause to be removed dust sampling devices from miners in designated occupations for sampling (DO), that is, MMU operators and roof bolters, for less than the entire shift when samples are required to be taken;

(c) **CHARLEY BARBER, STEVEN DEMOSS, RON IVY, JOHN ELLIS SCOTT,** and **JEREMY HACKNEY,** agents of Armstrong Coal Company, an unindicted co-conspirator, and other conspirators both known and unknown to the grand jury, did improperly and contrary to their training and to regulations certify dust results when they knew, or had reason to know, that sampling devices had not been examined during the second and last hour of shifts, that dust

sampling devices had been dropped or damaged without notation on the dust data card that the sample might be voidable, that results were certified in advance of shifts, and that persons certified to conduct dust sampling were assigned to other duties, or had otherwise left the mine during shifts on which they certified that they were present and conducting the tests;

(d) **STEVEN DEMOSS, RON IVY, JOHN ELLIS SCOTT,** and **JEREMY HACKNEY,** agents of Armstrong Coal Company, an unindicted co-conspirator, and other conspirators both known and unknown to the grand jury, did improperly and contrary to their training and to regulations allow dust sampling devices to run for several minutes outside of the mine in clean air rooms, both prior to and at the conclusion of the shift, and prior to the cassettes being removed from the devices and being mailed to MSHA.

## OVERT ACTS

16. In furtherance of the conspiracy and to effect the objects thereof, the defendants and co-conspirators performed in the Western District of Kentucky, Muhlenberg and Ohio Counties, and elsewhere, among others, the following overt acts:

17. In or about August of 2013, **CHARLEY BARBER,** then Superintendent of Parkway Mine, met with an unindicted co-conspirator, whose identity is known to the Grand Jury, and ordered him to do whatever you have to do to "make the pumps come in."

18. On or about and between August 5, 2014, and July 21, 2015, **STEVEN DEMOSS,** and unindicted co-conspirators whose identities are known to the grand jury, falsified dust data cards by representing that they had conducted dust sampling when, in fact, they had travelled with an MSHA inspector and performed other duties during the time the sampling was represented to have occurred.

19. On or about May 15, 2015, **JOHN ELLIS SCOTT** and **JEREMY HACKNEY**, signed and caused to be submitted to MSHA dust data cards representing that sampling had occurred during a shift, when, in fact, power was off at Parkway Mine and the mine had been evacuated.

20. On or about and between January 1, 2013, and continuing through August 8, 2015, **BRIAN KEITH CASEBIER, STEVEN DEMOSS, BILLIE HEARLD, RON IVY** and **DWIGHT FULKERSON,** removed dust sampling devices from miners on MMU's prior to the end of the required sampling period.

21. On or about November 18, 2014, **STEVEN DEMOSS** and **JOHN ELLIS SCOTT,** voided samples and removed, or caused to be removed, dust sampling devices from MMU operators on two mining sections at Parkway Mine because of excessive dust but nevertheless continued to mine coal on the sections and certified and submitted false statements on dust data cards as to the amount of coal mined on the shift, and the length of production time.

22. On or about and between January 8, 2014, and July 11, 2015, **RON IVY,** ordered certified persons performing dust sampling at Kronos Mine to perform other duties when the law and their training required that they perform checks on the dust sampling devices during those periods.

23. On or about and between January 7, 2013, and January 9, 2014, **STEVEN DEMOSS** at Parkway Mine and an unindicted co-conspirator whose identity is known to the grand jury, at Kronos Mine, certified dust sampling results on dust data cards for two successive shifts representing 16 hours underground when, in fact, they had clocked out after 12 hours and left the mine.

24. On or about and between August 5, 2014, and August 6, 2015, **STEVEN DEMOSS** and **JOHN ELLIS SCOTT** at Parkway mine and **RON IVY** and **JEREMY HACKNEY** at Kronos mine caused dust sampling devices to run in a clean air rooms both before and after the production shift so as to dilute the amount of dust in the sample prior to submission to MSHA.

In violation of Title 18, United States Code, Section 371.

A TRUE BILL.

REDACTED

_____
RUSSELL M. COLEMAN
UNITED STATES ATTORNEY

RMC:rr:07/10/18

UNITED STATES OF AMERICA v. **CHARLEY BARBER, BRIAN KEITH CASEBIER, STEVEN DEMOSS, BILLIE HEARLD, RON IVY, JOHN ELLIS SCOTT, DWIGHT FULKERSON, JEREMY HACKNEY**

## PENALTIES

Count 1:  NM 5 yrs. or $250,000 fine ob/3 Supervised Release

## NOTICE

**ANY PERSON CONVICTED OF AN OFFENSE AGAINST THE UNITED STATES SHALL BE SUBJECT TO SPECIAL ASSESSMENTS, FINES, RESTITUTION & COSTS.**

SPECIAL ASSESSMENTS

18 U.S.C. § 3013 requires that a special assessment shall be imposed for each count of a conviction of offenses committed after November 11, 1984, as follows:

| | | | |
|---|---|---|---|
| Misdemeanor: | $ 25 per count/individual | Felony: | $100 per count/individual |
| | $125 per count/other | | $400 per count/other |

FINES

In addition to any of the above assessments, you may also be sentenced to pay a fine. Such fine is due <u>immediately</u> unless the court issues an order requiring payment by a date certain or sets out an installment schedule. You shall provide the United States Attorney's Office with a current mailing address for the entire period that any part of the fine remains unpaid, or you may be held in contempt of court.  18 U.S.C. § 3571, 3572, 3611, 3612

<u>Failure to pay fine as ordered may subject you to the following</u>:

1. **INTEREST** and **PENALTIES** as applicable by law according to last date of offense.

    For offenses occurring after December 12, 1987:

    No **INTEREST** will accrue on fines under $2,500.00.

    **INTEREST** will accrue according to the Federal Civil Post-Judgment Interest Rate in effect at the time of sentencing. This rate changes monthly. Interest accrues from the first business day following the two week period after the date a fine is imposed.

    **PENALTIES** of:

    10% of fine balance if payment more than 30 days late.

    15% of fine balance if payment more than 90 days late.

2. Recordation of a **LIEN** shall have the same force and effect as a tax lien.

3. Continuous **GARNISHMENT** may apply until your fine is paid.

    18 U.S.C. §§ 3612, 3613

    If you **WILLFULLY** refuse to pay your fine, you shall be subject to an **ADDITIONAL FINE** of not more than the greater of $10,000 or twice the unpaid balance of the fine; or **IMPRISONMENT** for not more than 1 year or both.  18 U.S.C. § 3615

RESTITUTION

If you are convicted of an offense under Title 18, U.S.C., or under certain air piracy offenses, you may also be ordered to make restitution to any victim of the offense, in addition to, or in lieu of any other penalty authorized by law. 18 U.S.C. § 3663

APPEAL

If you appeal your conviction and the sentence to pay your fine is stayed pending appeal, the court shall require:

1. That you deposit the entire fine amount (or the amount due under an installment schedule during the time of your appeal) in an escrow account with the U.S. District Court Clerk, or

2. Give bond for payment thereof.

18 U.S.C. § 3572(g)

PAYMENTS

If you are ordered to make payments to the U.S. District Court Clerk's Office, certified checks or money orders should be made payable to the Clerk, U.S. District Court and delivered to the appropriate division office listed below:

LOUISVILLE:                           Clerk, U.S. District Court
106 Gene Snyder U.S. Courthouse
601 West Broadway
Louisville, KY  40202
502/625-3500

BOWLING GREEN:                        Clerk, U.S. District Court
120 Federal Building
241 East Main Street
Bowling Green, KY  42101
270/393-2500

OWENSBORO:                            Clerk, U.S. District Court
126 Federal Building
423 Frederica
Owensboro, KY  42301
270/689-4400

PADUCAH:                              Clerk, U.S. District Court
127 Federal Building
501 Broadway
Paducah, KY  42001
270/415-6400

If the court finds that you have the present ability to pay, an order may direct imprisonment until payment is made.

FORM DBD-34
JUN.85

No. 4:18CR-15-JHM

FILED
DISTRICT COURT CLERK
WESTERN DISTRICT OF KY

2018 JUL 11 AM 10: 25

# UNITED STATES DISTRICT COURT
Western District of Kentucky
at Owensboro

## THE UNITED STATES OF AMERICA

vs.

**CHARLEY BARBER, BRIAN KEITH CASEBIER, STEVE DEMOSS, BILLIE HEARLD, RON IVY, JOHN ELLIS SCOTT, DWIGHT FULKERSON, JEREMY HACKNEY**

## INDICTMENT

Count 1
Conspiracy to Defraud the U.S.
18 U.S.C. §371

*A true bill.*

REDACTED

*Filed in open court this 11th day of July, 2018.*

Clerk

*Bail, $*